

**RECEIVED**
CM
6/8/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| <u>**SHEDRICK BOWES-NORTHERN**</u> | ) | |
| _____, | ) | **1:22-CV-03031** |
| **Plaintiff(s),** | ) | **RANDOM** |
| **vs.** | ) | Case No. |
| **PEDCOR MANAGEMENT CORP,** | ) | |
| **VALPARAISO FIRE DEPARTMENT, KURT GLOMB,** | ) | **JUDGE WOOD** |
| **NORTHWEST COMMUNITY ACTION CORP,** | ) | **MAGISTRATE JUDGE MCSHAIN** |
| **MARCELLA ESCAMILLA,** | ) | |
| ~~**DEZIRAIE RENOVALES,**~~ | ) | |
| **JOHN DOE, AND CALVIN DOE** | ) | |
| **Defendant(s).** | ) | |

## <u>COMPLAINT FOR VIOLATION OF CONSTITUTIONAL RIGHTS</u>

*This form complaint is designed to help you, as a* **pro se** *plaintiff, state your case in a clear manner. Please read the directions and the numbered paragraphs carefully. Some paragraphs may not apply to you. You may cross out paragraphs that do not apply to you. All references to "plaintiff" and "defendant" are stated in the singular but will apply to more than one plaintiff or defendant if that is the nature of the case.*

1.  This is a claim for violation of plaintiff's civil rights as protected by the Constitution and laws of the United States under 42 U.S.C. §§ 1983, 1985, and 1986.

2.  The court has jurisdiction under 28 U.S.C. §§ 1343 and 1367.

3.  Plaintiff's full name is _____ **SHEDRICK BOWES-NORTHERN** _____.

*If there are additional plaintiffs, fill in the above information as to the first-named plaintiff and complete the information for each additional plaintiff on an extra sheet.*

1

4. Defendant, _____, is
   (name, badge number if known)

   ☑ an officer or official employed by  **VALPARAISO FIRE DEPARTMENT** ;
      (department or agency of government)

   _____ or

   ☐ an individual not employed by a governmental entity.

*If there are additional defendants, fill in the above information as to the first-named defendant and complete the information for each additional defendant on an extra sheet.*

5. The municipality, township or county under whose authority defendant officer or official

   acted is _____ **CITY OF VALPARAISO** _____ . As to plaintiff's federal

   constitutional claims, the municipality, township or county is a defendant only if

   custom or policy allegations are made at paragraph 7 below.

6. On or about **MARCH 28, 2022** , at approximately _____ **11** _____ ☑ a.m. ☐ p.m.
   (month, day, year)

   plaintiff was present in the municipality (or unincorporated area) of _____

   _____ **VALPARAISO** _____ , in the County of _____ **PORTER** _____ ,

   State of Illinois, at _____ **VALPARAISO, IN** _____ ,
   (identify location as precisely as possible)

   when defendant violated plaintiff's civil rights as follows *(Place X in each box that applies)*:

   ☐ arrested or seized plaintiff without probable cause to believe that plaintiff had committed, was committing or was about to commit a crime;

   ☐ searched plaintiff or his property without a warrant and without reasonable cause;

   ☐ used excessive force upon plaintiff;

   ☑ failed to intervene to protect plaintiff from violation of plaintiff's civil rights by one or more other defendants;

   ☐ failed to provide plaintiff with needed medical care;

   ☑ conspired together to violate one or more of plaintiff's civil rights;

   ☐ Other:

   _____

   _____

_____.

7.      Defendant officer or official acted pursuant to a custom or policy of defendant

municipality,  county or township, which custom or policy is the following: (***Leave blank***

***if no custom or policy is alleged***):_____

_____

_____

_____.

8.      Plaintiff was charged with one or more crimes, specifically:

_____

_____

_____

_____

_____

9.      (***Place an X in the box that applies.  If none applies, you may describe the criminal***
        ***proceedings under "Other"***)  The criminal proceedings

☐   are still pending.

☐   were terminated in favor of plaintiff in a manner indicating plaintiff was innocent.[1]

☐   Plaintiff was found guilty of one or more charges because defendant deprived me of a

fair trial as follows_____

_____.

☐   Other: _____.

_____

    [1]Examples of termination in favor of the plaintiff in a manner indicating plaintiff was innocent
may include a judgment of not guilty, reversal of a conviction on direct appeal, expungement of the
conviction, a voluntary dismissal (SOL) by the prosecutor, or a *nolle prosequi* order.

3

10.    Plaintiff further alleges as follows: (*Describe what happened that you believe supports your claims.  To the extent possible, be specific as to your own actions and the actions of each defendant.*)

## SEE ATTACHMENTS

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____ .

11.    Defendant acted knowingly, intentionally, willfully and maliciously.

12.    As a result of defendant's conduct, plaintiff was injured as follows:

## SEE ATTACHMENTS

_____

_____

_____ .

13.    Plaintiff asks that the case be tried by a jury.    ☑Yes        ☐ No

4

14. Plaintiff also claims violation of rights that may be protected by the laws of Illinois, such as false arrest, assault, battery, false imprisonment, malicious prosecution, conspiracy, and/or any other claim that may be supported by the allegations of this complaint.

**WHEREFORE,** plaintiff asks for the following relief:

A. Damages to compensate for all bodily harm, emotional harm, pain and suffering, loss of income, loss of enjoyment of life, property damage and any other injuries inflicted by defendant;

B. ☒ *(Place X in box if you are seeking punitive damages.)* Punitive damages against the individual defendant; and

C. Such injunctive, declaratory, or other relief as may be appropriate, including attorney's fees and reasonable expenses as authorized by 42 U.S.C. § 1988.

Plaintiff's signature: _Shedrick B_

Plaintiff's name *(print clearly or type)*: **SHEDRICK BOWES-NORTHERN**

Plaintiff's mailing address: **1101 CUMBERLAND CROSSING DR #202**

City **VALPARAISO** State **IN** ZIP **46383**

Plaintiff's telephone number: ( ) **312-292-1945** .

Plaintiff's email address *(if you prefer to be contacted by email)*: **SHEDRICKCHILDREN@GMAIL.COM**

15. Plaintiff has previously filed a case in this district. ☐ Yes ☐ No

*If yes, please list the cases below.*

*Any additional plaintiffs must sign the complaint and provide the same information as the first plaintiff. An additional signature page may be added.*

5

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SHEDRICK BOWES-NORTHERN, | |
| Plaintiff, | Civil Action No.: _____ |
| | **COMPLAINT** |
| v. | |
| PEDCOR AFFORDABLE MANAGEMENT, INC., VALPARAISO FIRE DEPARTMENT, KURT GLOMB, NORTHWEST COMMUNITY ACTION; MARCELLA ESCAMILLA; DEZIRAIE RENOVALES; JOHN DOE; and CALVIN DOE | |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

## I.    NATURE OF THE COMPLAINT

1.  This is an action for declaratory judgment, permanent injunctive relief, damages, costs, and attorneys' fees, alleging a continuing pattern of racially discriminatory conduct in violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601-19 ("F.H.A."). Plaintiff Shedrick Northern, who is African American, also asserts causes of action for breach of contract and infliction of emotional distress.

2.  The Defendants' failure to investigate into the complaints of Mr. Northern concerning violent racial harassment and concomitant failure to intervene on Mr. Northern's behalf violated his rights under the F.H.A. and other civil rights statutes by creating a hostile

living environment and interfered with his right to peaceful enjoyment of his home. The F.H.A. and other civil rights statutes prohibit a landlord from tolerating and/or facilitating racial harassment by it administration or a neighboring tenant. Specifically, the F.H.A. and the 1866 Civil Rights Act require a landlord to take reasonable steps to investigate allegations of racial harassment by a neighboring tenant or the administration once notified, as it would any alleged violation of a lease term. The Defendants took no steps to investigate clear evidence of racial harassment or protect Mr. Northern even after it was established that the laws had been broken, let alone the terms of his lease.

3.    The Defendants chose to do nothing. As a result of Defendant's harassing conduct, and the Defendant administration toleration and/or facilitation of that conduct, Mr. Northern was subjected to a racially hostile living environment and suffered significant injury for which he now seeks redress in this Complaint.

## II.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction under I.C. 33-29-1.5-2(1), which provides for original jurisdiction in all civil cases. Moreover, the jurisdiction is conferred on this Court by 42 U.S.C. § 3613(a)-(b) and by 28 U.S.C. §§ 1331, 1337, 1343 and 2201. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the related state law claims for breach of contract, negligent infliction of emotional distress, and intentional infliction of emotional distress.

2.    Venue is proper For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented. Plaintiff

believes that he won't receive fairness if this matter goes to trial if the trial was held in Indiana Northern District. See 28 U.S. Code § 1404 - Change of venue

## III.   PARTIES

1.  Plaintiff, Mr. Shedrick Bowes-Northern, is an individual of address 2810 Double Eagle Lane, Apt. 1, Valparaiso, IN, 46383 Unit 412. Due to the mold in his apartment, he's currently homeless.

2.  Defendant, Pedcor Affordable Management, Inc., is a company organized and operates in Indiana. The address for the said Defendant is One Pedcor Square 770 3rd Avenue, S.W. Cannel, IN 46032.

3.  Defendant, Valparaiso Fire Department, is a fire department located at address 205 Indiana Ave, Valparaiso, IN 46383.

4.  Defendant Kurt Glomb is an individual of address 205 Indiana Ave, Valparaiso, IN 46383. Upon Plaintiff's information and belief, the said Defendant was a fireman at the Valparaiso Fire Department.

5.  Defendant, Deziraie Renovales, is an individual of address One Pedcor Square 770 3rd Avenue, S.W. Cannel, IN 46032. Upon Plaintiff's information and belief, the said Defendant is the Apartment manager at the Master's Apartments employed by Pedcor management corps.

6.  Defendant John Doe is an individual of address One Pedcor Square 770 3rd Avenue, S.W. Cannel, IN 46032. Upon Plaintiff's information and belief, Defendant is a maintenance worker at the Master's Apartments employed by Pedcor management corps.

7.  Defendant Calvin Doe is an individual of address One Pedcor Square 770 3rd Avenue, S.W. Cannel, IN 46032. Upon Plaintiff's information and belief, the said Defendant is a maintenance worker at the Master's Apartments employed by Pedcor management corps.

## IV.    FACTUAL BACKGROUND

1.      On March 28, 2020, Plaintiff entered his apartment and heard the sound of water coming from the laundry closet. When Plaintiff opened his apartment closet, water poured out from the upstairs apartment. Plaintiff called the leasing office, but no one answered the phone. Finally, Plaintiff called his upstairs neighbor Kim to tell her that water was leaking from her apartment. She stated that her toilet was over-flooding and that she notified the leasing office about the issue, and they told her that maintenance was on lunch and would come over there when done.

*(Exhibit 1- Audio recording of Plaintiff reporting the issue with the leaking laundry closet)*

2.      Plaintiff then went to the leasing office to complain about the toilet water in his unit from his neighbor Kim's apartment. Alicia, who works in the leasing office, acted like she wasn't aware of what was going on. Alicia said that she would inform maintenance about the water leak in Plaintiff's apartment.

3.      An hour or so later, Plaintiff saw maintenance go into his upstairs neighbor Kim's apartment to fix the issue that she was having with her toilet over-flooding. When Plaintiff saw maintenance leave her apartment, Plaintiff thought that maintenance would come in and fix the leak caused by his neighbor's toilet over-flooding after they left his neighbor's apartment.

4.    When Plaintiff noticed that maintenance was gone and never came downstairs to inspect the water leak in his apartment, Plaintiff called Kim and asked her whether maintenance came in to fix her toilet. Kim said they came and fixed her toilet, and she told them that water from her apartment had flooded into Plaintiff's laundry closet. She said maintenance told her that they would deal with Plaintiff later as if Plaintiff's health and life were worthless.

5.    Approximately four hours later, John and Calvin came into Plaintiff's apartment to look at the ceiling water leak.

*(Exhibit 2- Video recording of John and Calvin).*

6.    They both said that the water had dried up, and it was nothing that they saw that was dangerous or could cause Plaintiff any issues. Plaintiff asked them whether they thought the water was still in the ceiling from his neighbor's toilet over-flooding. Again, they both stated that everything looked safe and dry. They only looked in the closet with a flashlight but never took the light cover off to see if it was water in the ceiling or ceiling light.

7.    On March 28, 2022, Plaintiff contacted the Valparaiso fire department and explained that water was leaking into his laundry area ceiling light from his upstairs neighbor's toilet flooding. Plaintiff stated to the fire department operator that he believes it was a fire hazard. Although the Valparaiso fire department operator said that he would send Valparaiso fire department inspector Kurt Glomb to check out the issue, he stated that Kurt wouldn't be back for days. He noted that water leaking into the ceiling light fixture wasn't a safety issue. But Valparaiso fire department inspector Kurt Glomb would inspect the light fixture leak. Unfortunately, that never happened until Plaintiff called the fire

department back complaining about the water in his ceiling that poured into his face on April 11, 2022. Water leaking through a light fixture can cause a fire. It's common for moisture to trigger the electrical charge in the fixture and cause it to spark, which could lead to a fire breaking out.

8.      On April 05, 2022, Plaintiff met Deziraie Renovales about the new lease. In that rental lease agreement, it says that the Owner will not be held responsible for the death, injury, illness and/or mental impairment of any resident caused and/or aggravated by any prior injury or illness of the resident, whether known or unknown, through the use of any amenities. Owner, its employees, agents, administrators, successors and assigns, of and from any and all manner of actions, suits, debts, accounts, damages, judgments, executors, claims, or demands whatsoever in law or equity, or otherwise that resident, resident's heirs, executors, or administrators hereafter can, shall or may have, against Owner, for upon or by reason of any injury resident may sustain or incur.

*(Exhibit 3- The Masters Lease Agreement)*

9.      Deziraie Renovales said that everything was fixed and safe in Plaintiff's apartment. Despite Plaintiff constantly complaining about electric current coming through his bedroom walls at night and sometimes doing the day.

10.     On April 5, 2022, the Defendant sent Plaintiff a Notice to Quit, stating that it would terminate the lease on the ground of Plaintiff's alleged non-compliance with the terms of the lease.

*(Exhibit 4- Notice to Quit)*

11.    On April 11, 2022, Plaintiff had an inspection with the Northwest community action inspector Marcella Escamilla. Plaintiff informed her about the ceiling leak in the laundry room closet.

*(Exhibit 5- Video recording of water coming from the ceiling)*

12.    She asked Plaintiff whether he thought it was still water in the ceiling light. Plaintiff told her that maintenance said that it was dry and safe. Marcella said she had to ensure that everything was safe in the laundry room closet. Marcella asked Plaintiff if he could unscrew the ceiling light fixture so she could make sure that everything was safe. First, she turned off the electricity for the laundry room closet. When Plaintiff unscrewed the ceiling light cover, approximately a gallon of dirty old toilet water splashed into Marcella and Plaintiff's face. Some of the water got into Plaintiff's ears.

13.    Marcella Escamilla called the Masters apartments manager, Deziraie Renovales. Deziraie told Marcella that maintenance came to Plaintiff's apartment on March 28, 2022, and saw that nothing was wrong with the ceiling light fixture in the closet. However, Marcella told Deziraie that she told Plaintiff to unscrew the closet ceiling light fixture, and water had poured all over her and Plaintiff when he unscrewed the ceiling light cover. Plaintiff having diabetes and having high blood pressure makes it easy for him to catch infections, leading to health problems that could cause serious health issues. Additionally, Marcella told Deziraie that Plaintiff would not be able to turn the electricity back on until maintenance fixed the leak in Plaintiff's apartment.

14.    Deziraie Renovales came to Plaintiff's apartment with John and Calvin, the same two maintenance men who lied and said that the laundry closet ceiling leak was safe and there is nothing to worry about. John and Calvin suggested that the light bulbs just

needed to be changed and nothing else. However, Marcella said that the whole ceiling light needed to be changed. Maintenance only replaced the ceiling light instead of removing the wet ceiling that could potentially turn into mold from the water damage. Plaintiff thought that maintenance would replace the ceiling, mainly since it was toilet water and water was in the ceiling for more than two weeks. Mold thrives in damp, humid conditions; even if it's a minor leak, it can lead to mold infestation if not fixed timely. Maintenance never dried out the area; they only put a new light fixture in the Plaintiff's apartment. Unfortunately, maintenance once again didn't do their job. Any moisture trapped in your ceiling can cause mold infestation and structural damage. Marcella still passed the apartment despite knowing that the ceiling could cause Plaintiff health problems from mold. The water was in the ceiling for approximately two weeks, enough time to generate mold.

15.    Plaintiff has been complaining about the issue for over seven months. Unfortunately, the Master Apartments manager or staff never sent an electrician to see what was causing the problem. The Master Apartments ignored Plaintiff for months. Plaintiff is not the only tenant that complains about Deziraie Renovale's poor attitude and management, the Master's apartment maintenance staff, and the Pedcor management company. For instance, Plaintiff's neighbor with two small children complained to Deziraie about her smoke detector having water damage. She called the fire department to make sure everything was safe. Unfortunately, when the fire department took down her smoke detector, it was full of water. The Master's apartment maintenance workers replaced the smoke detector but never checked to see if it was mold in her ceiling, which could lead to her and her children being sick from mold exposure.

16.    On April 22, 2022, Plaintiff went into the Master Apartment leasing office to discuss issues with the 30-day notice balance he received from the leasing office.

*(Exhibit 7- Audio recording of Plaintiff's visit at the leasing office)*

17.    Plaintiff told Deziraie Renovale that she ensured Plaintiff that everything in his apartment unit was safe when they were going over the lease. In response, Deziraie lied and said she wasn't aware of the leak until the NorthWest community action inspector Marcella Escamilla informed her on April 11, 2022. Additionally, Deziraie said that maintenance took care of the leak when Plaintiff first complained about the leak in his laundry room closet. Plaintiff explained to Deziraie what happened when maintenance workers John and Calvin came to his apartment to inspect the leak in his closet. Plaintiff told Deziraie that when maintenance came over there, they said that the water had dried up and everything was safe after Plaintiff informed them that much water was coming from his laundry room ceiling. Deziraie said every work order was detailed, maintenance addressed and fixed the issue, and closed the work order. Plaintiff told Deziraie that she committed a crime when backdated Plaintiff's lease.


## V.    CAUSES OF ACTION

### COUNT 1 (Breach of implied duty of good faith and fair dealing)

### As to Pedcor Affordable Management, Inc.

1.    The preceding paragraphs are fully incorporated herein.

2.    First, a contractual relationship existed between Plaintiff and Defendant. Notably, the parties had entered a lease agreement for Plaintiff's apartment.

3.      Part of the implied duties of the Defendant included the duty to ensure Plaintiff's enjoyment of the apartment is not impeded by nuisance such as the leaking toilet water.

4.      When Plaintiff noticed the issue of the ceiling water leak, he notified the Defendant. However, Defendant failed to address the issue, thus exposing Plaintiff to health and fire risks. The impact of the Defendant's inattention can be seen from the incidence when Plaintiff unscrewed the ceiling light cover, and approximately a gallon of dirty old toilet water splashed into Marcella and Plaintiff's face. Some of the water even got into Plaintiff's ears.

5.      As a result of the Defendant's inaction, Plaintiff is exposed to health and fire hazard. Notably, Plaintiff has diabetes and high blood pressure. This makes it easy for him to catch infections, leading to health problems that could cause serious health issues. Further, the leaking water may cause fire. It is for this reason that Marcella told Deziraie that Plaintiff would not be able to turn the electricity back on until maintenance fixed the leak in Plaintiff's apartment. It follows; Defendant should be held liable for the breach of the said implied duty of good faith and fair dealing.

## COUNT 2 (Breach of the common law implied warrant of habitability)

## As to Pedcor Affordable Management, Inc.

6.      The preceding paragraphs are fully incorporated herein.

7.      In Indiana, a tenant can prevail against a landlord who failed to keep the apartment building safe for use.

8.      The implied warrant of habitability implies that the home should be free from unsafe conditions (bad wiring, lack of running water, leaking sewerage, holes in the floor, etc.), substantial infestation of rats or cockroaches, or other such problems that significantly hinder its habitability.

9.      In the instant action, Plaintiff raised the issue of the ceiling water leak from the toilet above Plaintiff's apartment. He then notified Defendant. However, Defendant failed to address the issue, thus exposing Plaintiff to health and fire risks. The impact of Defendant's inattention can be seen from the incident when Plaintiff unscrewed the ceiling light cover, and approximately a gallon of dirty old toilet water splashed into Marcella and Plaintiff's face. Some of the water even got into Plaintiff's ears.

10.     As a result of Defendant's inaction, Plaintiff is exposed to health and fire hazards. Notably, Plaintiff has diabetes and high blood pressure. This makes it easy for him to catch infections, leading to health problems that could cause serious health issues. Further, the leaking water may cause a fire. For this reason, Marcella told Deziraie that Plaintiff would not be able to turn the electricity back on until maintenance fixed the leak in Plaintiff's apartment. It follows; that Defendant should be held liable for the breach of the implied duty of good faith and fair dealing.

## COUNT 3 (Breach of I.C. 32-31-8 *et seq*)

## As to Pedcor Affordable Management, Inc.

11.     The preceding paragraphs are fully incorporated herein.

12.     Landlords are obligated to deliver the rental premises in a safe, clean, and habitable condition. Further, a landlord is obligated to provide and maintain the following in good working condition: sanitary systems, plumbing systems, heating, and ventilating and air conditioning systems.

13.     In the instant action, the said Defendant had a duty to maintain the plumbing and sanitary system in a good and safe condition, pursuant to I.C. 32-31-8(5).

14.      Plaintiff raised the issue of the ceiling water leak from the toilet above Plaintiff's apartment. He then notified Defendant. However, Defendant failed to address the issue, thus

exposing Plaintiff to health and fire risks. The impact of Defendant's inattention can be seen from the incident when Plaintiff unscrewed the ceiling light cover, and approximately a gallon of dirty old toilet water splashed into Marcella and Plaintiff's face. Some of the water even got into Plaintiff's ears.

15.     As a result of Defendant's inaction, Plaintiff is exposed to health and fire hazards. Notably, Plaintiff has diabetes and high blood pressure. This makes it easy for him to catch infections, leading to health problems that could cause serious health issues. Further, the leaking water may cause a fire. For this reason, Marcella told Deziraie that Plaintiff would not be able to turn the electricity back on until maintenance fixed the leak in Plaintiff's apartment. It follows; that Defendant should be held liable for the breach of the implied duty of good faith and fair dealing.

## COUNT 4 (Intentional Infliction of Emotional Distress)

## As to All Defendants

16.     The preceding paragraphs are fully incorporated herein.

17.     As set forth above, the Defendants' conduct was extreme and outrageous.

18.     The Defendants ought to have reasonably known that their actions and/or inactions would cause severe harm to Plaintiff. Notably, Defendants ought to have known that failure to address the leaking toilet water would pose a severe health and fire risk to Plaintiff.

19.     Defendants filed to consider the adverse effects of their actions and/or inactions on Plaintiff.

20.     As a result of the Defendants' inaction, Plaintiff is exposed to health and fire hazards. Notably, Plaintiff has diabetes and high blood pressure. This makes it easy for him to catch infections, leading to health problems that could cause serious health issues. Further, the leaking water may cause a fire. For this reason, Marcella told Deziraie that Plaintiff would not be

able to turn the electricity back on until maintenance fixed the leak in Plaintiff's apartment. Defendant should be held liable for the breach of the said intentional infliction of emotional distress.

## COUNT 5 (Declaratory Judgment)

### As to All Defendants

21.    The preceding paragraphs are fully incorporated herein.

22.    There now exists, between the parties hereto, a dispute and controversy to which the Plaintiff and the Defendants are entitled to have a declaration of their rights and further relief relating to the facts and circumstances as set forth in this action.

23.    The dispute is whether the Defendants are liable for failing to address and/or promptly attend to the issue of the leaking toilet water from the ceiling.

24.    Plaintiff respectfully requests this Honorable Court issue a declaratory judgment declaring that the actions and/or inactions of the Defendant's actions and/or inactions are blameworthy, and issue appropriate remedies thereof.

## COUNT 6 (GROSS NEGLIGENCE)

### As to Defendants Valparaiso fire department, Kurt Glomb; John, and Calvin

25.    The preceding paragraphs are fully incorporated herein.

26.    A legal duty existed between the said Defendants and Plaintiff.

27.    First, the Valparaiso fire department had a duty to ensure there was no risk of fire caused by the leaking toilet water at Plaintiff's residence. Next, Kurt Glomb, who worked as a fireman for the Valparaiso fire department, was duty-bound to ensure Plaintiff was not exposed to a fire hazard from the leaking toilet water at the ceiling. As a social services organization, Northwest Community Action was duty-bound to ensure Plaintiff's concerns about his inhabitable

living environment were addressed. As the inspector for Northwest, Marcella Escamilla was duty-bound to conduct a timely inspection of the health and fire hazards at Plaintiff's house. Lastly, as maintenance workes for Masters Apartments, John and Calvin were obligated to identify any fault with the apartments and work on it.

28.    However, the Defendants breached their duties in diverse ways. First, John and Calvin were sent when Plaintiff contacted the Masters Apartments to raise concerns about the leaking toilet water from the neighbor's apartment. However, they failed to conduct proper investigations of Plaintiff's claims. They concluded briefly that the water would dry up, only for Plaintiff to find that the water had accumulated on the light fixture.

29.    Next, on March 28, 2022, Plaintiff contacted the Valparaiso fire department and explained that water was leaking into his laundry area light fixture and further stated that it was a fire hazard. Although the Valparaiso fireman said that he would send Kurt Glomb to check out the issue, he stated that Kurt would not be back for a couple of days, as if Plaintiff's life was not in danger. The fireman said that water leaking into the laundry room light fixture was not a safety issue. But they still would come in and check it out. Unfortunately, they did not check it. Plaintiff called them after toilet water had poured into his face on April 11, 2022.

30.    As a result of the Defendants' inaction, Plaintiff is exposed to health and fire hazards. Notably, Plaintiff has diabetes and high blood pressure. This makes it easy for him to catch infections, leading to health problems that could cause serious health issues. Further, the leaking water may cause a fire. For this reason, Marcella told Deziraie that Plaintiff would not be able to turn the electricity back on until maintenance fixed the leak in Plaintiff's apartment. Defendant should be held liable for the breach of the said intentional infliction of emotional distress.

31.    Had the Defendants not breached their duties, Plaintiff would not have suffered the injuries alleged above.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff is entitled to damages from the Defendants, and he hereby prays that judgment be entered in his favor and against the Defendants as follows:

i.    a declaratory judgment finding that the actions of all Defendants violate 42 U. S. C. §§ 3604 and 3617, 42 U.S.C. § 1981 and§ 198;

ii.    a declaratory judgment finding that the actions of the Defendants constitute negligent inflicion of emotional distress and breach of contract;

iii.    a declaratory judgment finding that the actions of Defendant Pedcor Affordable Management constitute intentional infliction of emotional distress;

iv.    a permanent injunction prohibiting Defendants from continuing to engage in the illegally discriminatory conduct alleged in this Complaint, including, without limitation, ordering Defendants to take actions or steps reasonably calculated to resolve any and all complaints of neighbor-on-neighbor harassment based on race, color, or any other ground prohibited by the Fair Housing Act of 1968 or the Civil Rights Act of 1866;

v.    compensatory damages to fully compensate Plaintiff for out-of-pocket rent paid during the period March 28, 2022-current

vi.    compensatory damages in an amount that would fully compensate the Plaintiff for the loss of enjoyment, humiliation, embarrassment, physical harm, emotional distress, and mental anguish caused by Defendants' violations of the law;

vii.    punitive damages in an amount that would punish Defendants for the willful, wanton, and reckless misconduct and indifference as alleged in this Complaint and that would effectively deter the Defendants from future discriminatory behavior;

viii.    Interest as provided by law;

ix.    reasonable attorneys' fees and costs; and

x.    all other relief deemed just and equitable by the Court.

## DEMAND FOR JURY TRIAL

Trial by jury is demanded on all issues.

Respectfully submitted:

_____

SHEDRICK NORTHERN
1101 cumberland crossing Drive #202
, Valparaiso, IN, 46383.
**Pro se**

Dated: 06/08/22

## APPENDIX-A

### Exhibit 1- Audio recording of Plaintiff

### reporting the issue with the leaking laundry

### closet

Plaintiff has attached the audio recording with this

filing

### Exhibit 2- Video recording of John and Calvin

Plaintiff has attached the video recording with this

filing

### Exhibit 3- The Master's Lease Agreement

Plaintiff has attached the Master's Lease Agreement with this filing, which is provided as

Appendix-B herewith

### Exhibit 4- Audio recording of Plaintiff reporting the issue with the leaking laundry closet

Plaintiff has attached the audio recording with this filing

### Exhibit 5- Video recording of water coming from the ceiling

Plaintiff has attached the video recording with this filing

**APPENDIX-B**

**EXHIBIT 3 – THE MASTER'S LEASE AGREEMENT**



**LEASE AGREEMENT**

Unit #  48  412
Lease ID: 425547

THE Pedcor Affordable Management, Inc., as duly authorized managing agent for the Owner (collectively, and/or individually, "Management") of the Apartment Community commonly known as **THE MASTERS I** ("Apartment Community"), leases to **SHEDRICK NORTHERN** (collectively, and/or individually, "Resident"), and Resident leases from Management at the Apartment Community, 2816 Double Eagle Lane Apt L., **VALPARAISO, IN #6385.** (the "Rental Unit") in reliance on Resident's application therefore, commencing on the 1st day of April, 2021, and ending on the 5th day of March 2022 (hereinafter, the "Term") paying therefore as rent to Management during said Term the total sum of **TEN THOUSAND SIX HUNDRED TWENTY DOLLARS ($10,620.00).** The total rental sum shall be payable in monthly installments of $885.00.

All payments are to be made to the management office, resident portal or ACH.

**1. RENTAL PAYMENT.** The full amount of the monthly installment shall be made on or before the 1st day of each month during the term of the Lease. The monthly installment will be prorated if the residency commences on any day other than the 1st day of the month or terminates on any day other than the last day of the month. Management reserves the right to refuse late rent. If all rent is not paid before the 4th day of the month (the late charge date), and Management elects to accept such late rent payment, Resident agrees to pay an initial late charge of $25.00. If rent is not paid before the 8th day of the month, and Management elects to accept such late rent payment, Resident agrees to pay an additional late charge of $25.00. In the event rent and the late charges remain unpaid by the 10th day of the month, legal action may be taken by Management against Resident for eviction and all sums then due, or which become due, under the Lease. Resident agrees and understands that any payment of rent, late fees, insufficient funds ("NSF Payment(s)"), or any other fees or charges, on or after the 10th of the month must be in the form of a cashier's check, money order or other verifiable electronic payment, including, but not limited to, ACH transfer. All payments received will be applied to the oldest balance due. Rent is not deemed accepted until it is deposited by Management or deposited in Management's account by certified electronic funds transfer. Management, may, at its sole discretion, accept and deposit partial payments. Resident further agrees that Management may accept a partial payment without waiving its right to take legal action to terminate this Lease and evict Resident from the Rental Unit. Resident agrees to continue to pay late fees each month until the entire outstanding balance due is paid in full.

Resident agrees to make a $25.00 NSF Payment for any payment Management receives that is returned or not processed due to there being insufficient funds in Resident's account. All NSF Payments must be remedied within 24 hours. Resident agrees and understands that upon Management receiving a second NSF Payment notice during the term of this Lease, all payments from that point on must be made in the form of cashier's check, money order or other verifiable electronic payment, including, but not limited to, ACH transfer.  NO CASH OF ANY AMOUNT WILL BE ACCEPTED IN THE ON SITE MANAGEMENT OFFICE.

**2. SPECIAL PROVISION(S):** ☐  Check if none.

SN

ADDITIONAL DEPOSIT/CONDITIONAL DEPOSIT    1770.00 SN
Resident agrees to pay an additional deposit of $1640.00. It is understood that this deposit may be applied to the last month of the rent with permission by management.
VOUCHER CLAUSE for Section 8 Participants
Resident has entered into a voucher contract with HUD. Said contract (Tenancy Addendum, HUD-52641-A) and lease are hereby incorporated into this agreement. The following appliances are provided by Ownership:
☑ Refrigerator  ☑ Range  ☑ Dishwasher  ☑ Garbage Disposal  ☐ Washer  ☐ Dryer  ☑ Microwave
☐ (Other)

1770.00 SN

**3. DEPOSITS.** A security deposit of **ONE HUNDRED DOLLARS ($100.00)** shall be paid prior to occupancy of the Rental Unit. The security deposit shall be held by Management as security for the payment of all rent and other amounts due from the Resident's occupancy, for the Resident's performance of this Lease, and applied to any unpaid rent, utilities and/or damages caused to the Rental Unit or any part of the Apartment Community by Resident, Resident's Occupants, family members, invitees, guests or any other person reasonably under Resident's control. Resident understands and agrees that the security deposit may not be applied as rent or against any other amount due from Resident to Management prior to Resident vacating the Rental Unit, and that the monthly rent must be paid each month, including the last month of the lease term. In compliance with Indiana law, within forty-five (45) days of termination or expiration of this Lease, Management shall return the security deposit, less any deductions for unpaid rent (as the term "rent" is defined by law), unpaid utilities and/or damages to the Rental Unit or Apartment Community, including but not limited to the cost of general cleaning, carpet cleaning and painting costs, reasonable wear and tear excepted, with a written itemization of such amount to Resident. Management's obligations contained in this paragraph are conditioned upon Resident first providing a forwarding address, in writing, to Management prior to move-out. UNDER NO CIRCUMSTANCES MAY RESIDENT APPLY THE SECURITY DEPOSIT AS THE LAST MONTHLY INSTALLMENT DUE PURSUANT TO THIS LEASE.

**4. RENTAL UNIT CONDITIONS/INSPECTIONS.** Resident acknowledges the Rental Unit is in good working condition at the commencement of this Lease and acknowledges that Resident has been provided with a move-in inspection form whereupon Resident may make exception to any conditions. Resident must supply a copy of this inspection form to Management at the Management office within 48 hours of receipt thereof.

IN EUP No Bond, 501C3, Rural 10.1.20

**5. UTILITIES, ETC.** Resident shall pay ▯ ...e following:    Electric ☑    Gas ☑    Water & Sewer ☐
It is Resident's responsibility to place these items in Resident's name and to maintain service with the provider with no lapses in service throughout Resident's tenancy. Failure to do so is a breach of this Lease and will result in a Twenty-Five Dollar ($25.00) administrative fee per unpaid invoice that is processed and paid by management, to be charged to, and paid by, Resident.

Management reserves the right to convert any utilities to separately metered services by giving the resident written notice at least thirty (30) days prior to such conversion. Upon any such conversion, Resident will then be responsible for and pay to the utility or the utility's agent, the metered utility charges. Resident is responsible for communication line maintenance charges or other applicable monthly service fees applied by communication providers. Management shall have the right at any time during the term of this Lease to contract for service for the Apartment Community and each unit from different companies providing electrical, natural gas, cable television or other utility services (each a, "Utility Service Provider"). Resident always agrees to cooperate with Management and all Utility Service Providers and, as reasonably necessary, to allow Management and all Utility Service Providers access to utility lines and facilities within the Rental Unit. Management shall not be liable for any loss, damage or expense Resident may incur because of any change, failure or defect in the supply or furnishing of utility services furnished to the Apartment Community or Rental Unit and no such change, failure or defect shall constitute an actual or constructive eviction, or entitle Resident to any abatement or diminution of rent under this Lease. To the extent Resident is permitted by law to select a Utility Service Provider other than the company selected by Management, Resident shall:

(a)    reimburse the cost of repairing all damage to the premises caused directly or indirectly by Resident's Utility Service Provider; and

(b)    indemnify and hold harmless Management and the employees, agents, officers and principals of Management and the owner of the Apartment Community from all claims, demands, costs and expenses (including attorneys' fees) arising out of or in any manner relating to actions or inaction by Resident's Utility Service Provider.

Discontinuance of the supply of any utility for which Resident is financially responsible by reason of Resident's failure to pay for said utility, or the use of some other supply of any utility outside of those supplied directly to the Residence without the prior written consent of Management, shall constitute a default or breach of this Lease and shall be sufficient grounds for Management to terminate this Lease consistent with the termination provisions set forth in this Lease. Resident agrees to reimburse Management for any damage done or expenses incurred by Management arising out of the discontinuance of the supply of any utility on account of Resident's failure to pay for same, including any expenses to Management to maintain a continued supply of any utility. Resident shall not interrupt, reduce, shut off, or cause termination of electricity, gas, water, or other essential services which may result in serious damage to the Rental Unit or Apartment Community. Management may temporarily interrupt or shut off services as a result of an emergency or to perform a good faith repair or necessary construction. Resident shall use the utilities only for ordinary household purposes and shall not waste utilities. Resident shall not tamper with, adjust, or disconnect any metering or sub-metering device or system.

**6. USE.** Resident agrees to use the Rental Unit solely as a private residence for Resident and the authorized occupants listed below ("Resident's Occupants"). No other person or persons will occupy the Rental Unit without having the prior written consent of Management. Resident agrees to comply with, and to procure compliance of all of Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control with Management's Rules and Regulations, a copy of which Resident has received and which is incorporated herein by reference as a part of this Lease. Resident further agrees not to violate any law or ordinance of any governmental authority with respect to the Rental Unit, or any common areas of the Apartment Community. Resident, Resident's Occupants, family members, invitees, guests or any other person reasonably under Resident's control shall not engage in any criminal activity, noise disturbances, or other unlawful or insolent behavior, in or around the Rental Unit or common areas of the Apartment Community.

No trade, business, or profession shall be conducted in the Rental Unit or any common areas of the Apartment Community. Resident shall not make or permit any use of the Rental Unit or common areas of the Apartment Community that (A) violates any law, regulation or ordinance, (B) damages the Apartment Community's reputation or (C) disturbs any other Resident or increases, or could increase, Management's or the Apartment Community's insurance liability. Resident, Resident's Occupants, family members, invitees, guests, and any other person reasonably under Resident's control shall not harass, threaten, or intimidate any other Resident, or Management's employees, agents, or contractors. Resident acknowledges that Resident is responsible for the conduct of Resident, Resident's Occupants, family members, invitees, guests, and any other person reasonably under Resident's control throughout the Apartment Community. The prohibition of certain uses or activities in this Lease shall not create in Resident any right of expectation that Management will enforce those prohibitions against other residents of the Apartment Community. This Lease does not create any duty of Management to keep Resident or any other person or entity secure in person or property.

Management may exclude from the Apartment Community Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control who, in Management's judgment, have been violating the law, violating this Lease or any Apartment Community Rules and Regulations, or disturbing other residents, neighbors, visitors, owners, owner's representatives or Management's employees, agents or contractors. Management may also exclude, from any outside area or common area of the Apartment Community, any person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, invitee or guest of a specific resident in the Apartment Community.

Authorized Occupants: <u>SHEDRICK NORTHERN, SHEVELLIA SCOTT, THADDAEUS SCOTT, ADDISON MILLER</u>

**7. PETS.** No pets may be brought into the Rental Unit or any common area of the Apartment Community at any time, except with the expressed written consent of Management as contained in a separate pet agreement, which shall be made a part of this Lease, and subject to all applicable pet fees and charges as set forth in that pet agreement. This policy is at the sole discretion of Management. Animals needed for people with disabilities are not considered pets but are subject to all federal and state laws regarding service and emotional support animals.

IN EUP No Bond, 501C3, Rural 10.1.20

8. **PARKING.** The designated parking are    the Apartment Community are limited to private p...enger vehicles and Resident shall have no right to store any vehicles, boats, or trailers, or other property in said parking areas without the prior written consent of Management. Car repairs are not permitted anywhere on the property. Resident hereby grants Management the right to remove any vehicle in the parking area which Management, in its sole discretion, believes is inoperable, which does not have a current license plate displayed, or which is parked in a handicapped/disabled parking spot without the proper tags or plates. Resident further agrees that any vehicle owned by Resident remaining in the Apartment Community after termination or expiration of this Lease may be removed by Management. Any removal of a vehicle, boat, or trailer by Management under this paragraph shall be performed at Resident's expense and Management shall not be liable for any costs or damage that may result from such removal.

9. **ALTERATIONS AND IMPROVEMENTS.** Resident shall make no alterations or improvements to the Rental Unit or Apartment Community without obtaining Management's prior written consent, including without limitation: painting, wallpapering, permanent shelving, floor covering, and the changing of locks, the installation of cameras and/or recording devices including, but not limited to, personal security devices such as video doorbells. All alterations, additions, or improvements made in and to the Rental Unit or Apartment Community shall be the property of Management and shall remain upon surrender of possession with the exception of white lined drapes or drapes with a white liner, which Resident agrees to provide for all windows during the entire term of the Lease.

10. **OBLIGATIONS OF RESIDENT.** Resident agrees to:

(A) Keep the Rental Unit and common areas of the Apartment Community that Resident uses safe, sanitary, and reasonably clean.
(B) Dispose of all rubbish, garbage, and other waste in a clean, safe, and sanitary manner in prescribed containers provided, if any.
(C) Use and keep all of the following in a reasonable manner:
    (1) Electrical systems.
    (2) Plumbing.
    (3) Sanitary systems.
    (4) Heating, ventilating, and air conditioning systems.
    (5) Elevators, if provided.
    (6) Facilities and appliances of the rental premises.
(D) Refrain from defacing, damaging, destroying, impairing, or removing any part of the Rental Unit or Apartment Community.
(E) Comply with the requirements imposed by Management at the time this Lease is entered into and all amended rules and regulations as provided during the term of this Lease and all applicable state and local housing, health, and safety codes;
(F) Personally refrain, and forbid Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control, from intentionally or negligently destroying, defacing, damaging, or removing any fixture, appliance, or other part of the Rental Unit or Apartment Community;
(G) Act in a manner and require other persons in the Rental Unit with Residents consent, to act in a manner that will not disturb Resident's neighbor's peaceful and quiet enjoyment of their Rental Unit and the Apartment Community.
(H) Use good judgment and thoughtfulness for others in the Rental Unit and Apartment Community.
(I) Not commit any waste or nuisance in, on or about the Rental Unit or Apartment Community.
(J) Not in any way annoy, molest or interfere with any other resident of the Apartment Community, Resident's Occupants, family members, invitees, guests or any other person reasonably under Resident's control or Management and Management's employees, agents, or contractors;
(K) Not waste, unreasonably use or otherwise use in a hazardous manner, any utilities furnished by Management.
(L) Promptly notify Management, in writing, of any repairs needed in the Rental Unit.
(M) Promptly reimburse Management for any damages to the Rental Unit that Management deems Resident responsible for, after receiving notice of the cost of such damages from Management.
(N) Use only white backed blinds or drapes as window and door coverings.

11. **REFURBISHMENT.** If the Term is not fulfilled, Resident will be held liable for all refurbishment costs, which shall include, but not be limited to, the costs of: painting, cleaning, and carpet cleaning, as well as any other costs associated with preparing the unit for a new resident. Regardless of whether or not the initial lease term has been fulfilled, Resident will also be liable for all damage, including, but not limited to: pest infestation control / extermination, and intentional or negligent damage that exceeds normal wear and tear that is caused by Resident, Resident's Occupants, family members, invitees, guests or any other person reasonably under Resident's control.

12. **POSSESSION AND FORCE MAJEURE.** Failure to deliver possession of the Rental Unit at the time agreed upon herein shall not subject Management to liability for damages beyond the amount of the deposit received from Resident. If Management is prevented from completing its obligations under this Lease due to an act of God, pandemic, epidemic, war, terrorism, flood, fire, hurricane, tornado, some similar occurrence, the failure of a current resident of the Rental Unit to vacate in a timely manner or if the occurrence of an event damages the property to the point where the habitability of the Rental Unit is affected, then Management, at its sole discretion, shall be excused from any further performance under the terms of this Lease, and this Lease shall be immediately terminated and Management shall have no obligation to provide alternate housing arrangements for Resident or to reimburse Resident for any resulting damages to person or property.

13. **ABANDONMENT.** The Rental Unit and/or Resident's personal property shall be considered abandoned if a reasonable person would conclude that Resident has vacated the Rental Unit and/or surrendered possession of Resident's personal property. Upon abandonment of the Rental Unit during the Term, Resident shall be liable for all refurbishment costs incurred by Management as outlined in paragraph 11 of this Lease. Resident agrees to pay such costs immediately upon receipt of an itemization of such costs. Following abandonment, in addition to Management's other rights and remedies under this Lease, Management may, but need not, enter into the Rental Unit and act as Resident's agent to perform necessary repairs and refurbishment, at Resident's sole cost and expense, in order to relet the Rental Unit. Management shall have no duty to procure prospective new residents or to otherwise mitigate damages and any attempt by Management to procure new tenants shall in no event constitute an agreement by Management to assume such duty. Management may let other similar rental units in the Apartment Community before reletting or attempting to relet Resident's abandoned Rental Unit. Any such reletting may be on such terms on which leases are then currently being offered for similar rental units in the Apartment Community.

IN EUP No Bond, 501C3, Rural 10.1.20

In the event any property belong... ... Resident shall come into Management's possessi... ...ter abandonment by Resident, the property may be removed from the Rental Unit by Management solely at the risk, cost and expense of Resident, and Management shall in no event be responsible as a warehouseman, bailee, or otherwise, for the value, preservation or safekeeping thereof for any property remaining in the Rental Unit and/or removed from the Rental Unit by Management. If Resident's property is removed and placed in storage as a result of abandonment of the Rental Unit by Resident, Resident shall pay to Management all expenses incurred by Management for removal and/ or storage of Resident's property.

**14. DEFAULT AND REMEDIES.** If Resident (A) defaults in the payment of any single installment of rent or any other sum required to be paid under this Lease or under any other agreement between Resident and Management, (B) abandons the Rental Unit, or (C) defaults in the performance of any other covenant, condition, provision, or agreement contained herein, the entire balance remaining under the terms of Lease shall be accelerated and all future rent shall become immediately due and owing, without relief from valuation or appraisement laws and Management may immediately exercise any and all legal and equitable remedies it may have, at Management's discretion, without prior written notice of default to Resident. **Upon any default under the terms of this Lease, Management shall be entitled to immediate possession of the Rental Unit.** Termination of this Lease for a breach of this Lease shall not release Resident from liability for payment of rent for the balance of the term of this Lease. If Management is granted possession of the Rental Unit from Resident by a court of competent jurisdiction and Resident's possessions are removed and placed in storage pursuant to court order, Resident shall pay to Management any and all expenses incurred by Management for removal and/ or storage of Resident's property. Resident further agrees that any third party who removes and/or stores Resident's possessions shall acquire a warehouseman's lien on those stored possessions, and if they are not timely reclaimed, the warehouseman may sell the stored goods in payment of the removal costs, storage costs, transfer costs, and all other related fees and costs. Likewise, in the event any property of Resident shall come into the possession of Management as a result of the termination of this Lease, Resident's property may be removed from the Rental Unit by Management solely at the risk, cost and expense of Resident, and Management shall not be responsible as a warehouseman, or bailee or otherwise for any property left on the Rental Unit by Resident, or for the value, preservation or safekeeping thereof. Resident shall pay to Management all expenses incurred in connection with the removal and/ or storage of Resident's property. Any property of Resident not removed from the Rental Unit by Resident at the expiration of the term of this Lease, whether by abandonment, default or otherwise, shall be deemed to have been forever abandoned by Resident, and may be disposed of in any manner by Management. **Resident shall be responsible for any and all court costs, collection costs, collection agency fees (including contingent collection agency fees), expenses and REASONABLE attorney's fees incurred by Management in connection with the enforcement of this Lease.**

WAIVER OF JURY TRIAL: TO MINIMIZE LEGAL EXPENSES AND, TO THE EXTENT ALLOWED BY LAW, TRIAL OF ANY LAWSUIT BASED ON STATUTE, COMMON LAW, AND/ OR OTHERWISE RELATED TO THIS LEASE SHALL BE TO A JUDGE AND NOT A JURY AND IN THE EVENT SUCH ACTION IS IN A SMALL CLAIMS COURT THE EXCLUSIVE JURISDICTION OF THE SMALL CLAIMS COURT OF THE TOWNSHIP OR COUNTY IN WHICH THE APARTMENT IS LOCATED, RESIDENT CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE SMALL CLAIMS COURT OF THE TOWNSHIP OR COUNTY IN WHICH THE APARTMENT IS LOCATED. RESIDENT UNDERSTANDS AND ACKNOWLEDGES THAT RESIDENT HAS SOUGHT, OR HAS HAD THE OPPORTUNITY TO SEEK, THE LEGAL COUNSEL OF AN ATTORNEY CONCERNING THE TERMS, COVENANTS AND CONDITIONS OF THIS LEASE.

**Resident agrees to accept electronic notification of service at the following electronic mail address for any and all judicial actions that may be brought by Management against Resident to enforce or otherwise interpret the terms of this Lease.**

**15. TRANSFERABILITY.** This Lease is not assignable or transferable by Resident without the prior written consent of Management, nor may Resident sublet all or any part of the Rental Unit without the prior written consent of Management. Any attempt to assign or transfer this Lease or to sublet the Rental Unit shall not relieve Resident of the obligations under this Lease.

**16. OTHER COVENANTS.** Resident's application to rent and Management's Community Addendum of Rules & Regulations current and as amended in the future are agreed to be part of this Lease, and the terms, conditions, and representations therein shall be binding upon Resident, Resident's occupants, family members, invitees, guests and all other persons reasonably under Resident's control. Any false statements, omissions, or other misrepresentations on said application by Resident may be grounds for termination of this Lease at the option of Management, regardless of when such false statements, omissions, or other misrepresentations are discovered by Management. Resident shall refrain from engaging in any illegal activity and violation of this covenant shall be grounds for immediate termination of this Lease at the sole option of Management.

**17. RIGHT OF ENTRY.** Management reserves, and has, the right to enter and inspect the Rental Unit at reasonable times after Management has given Resident reasonable notice (either written or verbal) of the need to enter. Resident agrees that Management may show the Rental Unit to prospective applicants during the thirty (30) day notice to vacate period described in paragraph 22, EXPIRATION, RENEWAL AND HOLDOVER. Management further reserves the right to enter and modify the Rental Unit and Apartment Community common areas as Management deems necessary, including, but not limited to, modifications necessary for compliance with the American with Disabilities Act ("ADA"), Fair Housing Act ("FHA") and any other federal or state rule or regulation. Management also reserves, and has, the right to enter the Rental Unit at reasonable times and for the time necessary, to examine, refurbish, install, construct, repair, restore and make any modifications to the Rental Unit and/or Apartment Community Management deems necessary, in Management's sole discretion, and Resident shall acquiesce to such entry and modification(s). Management reserves the right to enter the Rental Unit at any time and without any prior notice to Resident in an event that Management, in its sole discretion, deems an emergency for maintenance repairs or any other reason.

**18. SMOKE DETECTORS:** Resident acknowledges that a working UL-listed smoke detector has been installed on each floor of the Rental Unit. Resident shall inspect and test the smoke detector(s) during the Term (and during any extensions to the term of this Lease) and shall ensure that each smoke detector installed remains functional and is not disabled. If the smoke detector is battery operated, Resident shall replace the batteries in the smoke detector(s) as necessary. If the smoke detector is hard wired into the Rental Unit's electrical system, and Resident believes the smoke detector(s) is not functional, Resident should provide Management with written notification of the need to replace or repair the smoke detector(s). Management shall repair or replace an inoperable smoke detector within seven (7) working days after Management is given written notification of the need to replace or repair the smoke detector. Resident shall not tamper with, remove, or replace any parts or equipment of the smoke detector(s), except to replace batteries. Resident shall reimburse Management for the cost of any damage to the smoke detector, or to the Rental Unit or Apartment Community, caused or allowed by Resident's failure to comply with the obligations of this paragraph. Management shall not be liable for any injury or death to persons, nor IN EUP No Bond, 501C3, Rural 10.1.20

for damage to property, resulting from Resi. ..'s failure to test or inspect the smoke detector, repla. .. batteries as required; or to notify Management as provided herein. Resident shall maintain the smoke detector and test the smoke detector at least once every six (6) months to ensure that the smoke detector is in operational condition. Resident shall be liable for all damages and injuries (whether to Resident, Resident's Occupants, family members, invitees, guests, any other persons, personal property or the Rental Unit or the Apartment Community) resulting from Resident's failure to test or inspect the smoke detector(s), failure to replace batteries, any tampering with the smoke detector(s), or failure to notify Management as provided herein.

Resident's initials: ___S.V._____          Resident's initials: _____

19. **NOTICES.** Any notice to be given by either party to the other shall be in writing. Written notice from Management to Resident shall be either delivered personally, sent by U.S. mail, postage prepaid at the address of the Rental Unit or sent to Resident by electronic mail at address provided by resident. Written notice from Resident to Management shall be at the address of the on-site Management office of the Apartment Community or sent to Management by electronic mail to: **themasters@pedcor.net.**

20. **MANAGEMENT'S REPRESENTATIVE(S)**

THE PERSON RESIDING IN INDIANA AUTHORIZED TO MANAGE THE RENTAL UNIT AND APARTMENT COMMUNITY IS:

> Pedcor Affordable Management, Inc.
> One Pedcor Square
> 770 3rd Avenue, S.W.
> Carmel, IN 46032

**RESIDENT AGENT FOR SERVICE OF PROCESS, NOTICES AND DEMANDS IS:**

> Pedcor Legal Agent, LLC
> One Pedcor Square
> 770 3rd Avenue, S.W.
> Carmel, IN 46032

21. **FURNITURE.** If the Rental Unit is furnished an inventory shall be attached hereto and made a part hereof and signed by Resident. Resident agrees not to furnish the Rental Unit with a waterbed without the prior written consent of Management. Such consent shall be within the sole discretion of Management.

22. **EXPIRATION, RENEWAL AND HOLDOVER.** Unless otherwise eligible for early termination under federal or state law Resident may not terminate this Lease prior to expiration of the Term. Prior to expiration of the Term, Resident is required to give Management thirty (30) days written notice to vacate. Resident is responsible for the monthly rental amount through the thirty (30) day notice period. Resident's 30-day notice will only be effective to terminate the lease upon the expiration of the Term. After expiration of the Term, in the event the Parties do not enter into an agreement renewing or replacing this Lease, Resident's continued occupation of the Rental Unit shall be on a month-to-month basis, upon the same terms and conditions set forth in this Lease, unless and/or until either party shall thereafter give the other a written thirty (30) day notice of their intention to terminate this Lease. Notwithstanding the foregoing, Management reserves, and has, the right at the expiration of the Term of this Lease to increase the rent for the Rental Unit to the then market rate upon giving Resident (30) days prior written notice.

23. **AMENITIES.** Common area amenities are gratuitously provided for Resident's benefit and enjoyment and such benefits are not part of the consideration of this Lease. Management makes no warranties, express or implied, as to the habitability or as to the condition of the Rental Unit or the condition or function of any appliance, utility or common area amenities provided by Management to Resident.

24. **DRUG-FREE AND/OR CRIMINAL ACTIVITY FREE HOUSING**

Resident agrees as follows:

> a) Resident, Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control, shall not engage in criminal or quasi-criminal activity, including but not limited to drug or sex-related criminal activity, in the Rental Unit or in or near the Apartment Community. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use or possession with intent to manufacture, sell, distribute or use, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C.802) or the possession of drug paraphernalia. Sex related criminal activity means any crime that may have a sexual component and includes, but is not limited to, acts of, or threatened, physical harm (e.g. sexual assault) or mental or emotional harm to a victim (e.g. child pornography). By entering into this Lease, Resident warrants and represents on behalf of Resident, Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control that may dwell in or visit the Rental Unit, that they will not engage in, and that they have not been convicted of engaging in, any sex related criminal activity.

> b) Resident, Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control, shall not engage in acts of violence or threats of violence including, but not limited to: the unlawful possession or discharge of firearms in the Rental Unit or in, on or near the Apartment Community.

> c) Resident, Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control, shall not engage in acts that cause a court-approved search warrant to be issued for the Rental Unit or Apartment Community due to the danger and disturbance that the serving of a search warrant presents.

IN EUP No Bond, 501C3, Rural 10.1.20

d) Resident, Resident's Occupant, family members, invitees, guests and any other pers... reasonably under Resident's control, shall not engage in a pattern of conduct directed at a specific person that serves no legitimate purpose, and/or that would cause a reasonable person to suffer emotional distress or to feel annoyed or harassed, in, on or near the Apartment Community including, but not limited to, Management staff personnel.

e) Resident, Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control, shall not engage in acts of violence or threats of violence including, but not limited to, the unlawful possession or discharge of firearms on or near the premises.

f) Resident, Resident's Occupants, family members, invitees, guests and any other person reasonably under Resident's control, shall not engage in a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose directed at a specific person that serves no legitimate purpose, that would cause a reasonable person to suffer substantial emotional distress in, on or near the Apartment Community.

**VIOLATION OF ANY OF THE ABOVE PROVISIONS IS A MATERIAL BREACH OF THIS LEASE AND GOOD AND SUFFICIENT CAUSE FOR IMMEDIATE TERMINATION OF THIS LEASE.**

No arrests or convictions need to occur prior to Management declaring a breach of this Lease. Management's belief that some form of criminal or quasi-criminal activity, including but not limited to drug-related criminal activity has occurred, is a breach of this Lease, and Management shall have the right to immediate possession of the Rental Unit. Proof of any such activity shall not be required to be beyond a reasonable doubt but shall simply require that, more likely than not, such activity occurred or is occurring. Management is not responsible for obtaining criminal-history checks on Resident, Resident's Occupants, family members, invitees, guests, or any other person reasonably under Resident's control or Management's employees, agents, or contractors. If Resident, Resident's Occupants, family members, invitees, guests, or any other person reasonably under Resident's control is affected by a crime, Resident must make a written report to Management and to the appropriate local law-enforcement agency. Resident must also furnish Management with the law-enforcement agency's incident report upon request.

**25. SEVERABILITY.** If any provision in this Lease shall be deemed invalid by judgment or court order, all other provisions shall remain in full force and effect.

**26. JOINT LIABILITY.** "Resident" when used in this lease shall be construed to be plural for more than one person as described in this Lease, and any and all Residents shall be jointly and severally liable and obligated to perform all the terms, conditions, and covenants set forth in this Lease.

**27. WAIVER.** One or more waivers of any covenant, condition, rule, or regulation by management shall not be construed as a waiver of any covenant, condition, rule or regulation in the future or any waiver of a breach of this Lease.

**28. CAPTIONS.** The captions provided in this Lease are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope of this Lease or the intent of the provisions hereof.

**29. ENTIRE AGREEMENT AND MODIFICATIONS.** This Lease, together with any addendums, Community Addendum and any other covenants, conditions, and agreements, which by reference herein or hereto are made a part of this Lease, constitute the entire agreement. The Parties agree that there is no other agreement (oral or written) pertaining to this Lease. All modifications to this Lease shall be made in writing and shall be signed by all Parties in order to be effective.

**30. ATTORNEYS FEES.** In the event of the employment of an attorney by Management because of a breach by Resident of any of the terms or conditions of this Lease, Resident shall pay such attorney's fees and costs and all other costs and expenses incurred by Management in connection with such breach, which shall be considered additional rent.

**31. FAIR HOUSING.** Management does not discriminate against applicants based on race, sex, age, religion, national origin, familial status, or disability.

**32. PROPERTY DAMAGE, INSURANCE & SAFETY.** Management does not maintain insurance to cover Resident's personal property or personal injury. Management is not responsible to Resident, Resident's Occupants, family members, invitees, guests or any other person reasonably under Resident's control, for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, virus, bacteria or other disease or the negligence of others (the "Hazards").

**MANAGEMENT IS NOT RESPONSIBLE FOR SECURITY AND DOES NOT PROVIDE SECURITY FOR RESIDENT, RESIDENT'S OCCUPANTS, FAMILY MEMBERS, invitees, guests or ANY OTHER PERSON OR THEIR PERSONAL PROPERTY. ANY SECURITY CAMERAS IN THE RENTAL UNIT OR IN THE APARTMENT COMMUNITY ARE PLACED TO PROTECT MANAGEMENT PROPERTY AND ARE NOT MEANT TO BE USED FOR PERSONAL SAFETY. RESIDENT AGREES TO LOOK SOLELY TO THE PUBLIC POLICE FORCE FOR SUCH PROTECTION. IN THE EVENT THERE IS A SECURITY PRESENCE IN THE APARTMENT COMMUNITY, RESIDENT ACKNOWLEDGES THAT IT IS ONLY TO SAFEGUARD MANAGEMENT PROPERTY AND SHALL NOT BE RELIED UPON RESIDENT FOR ANY PURPOSE.**

**33. CONSENT TO DISCLOSURE.** Resident hereby consents to Management's disclosure of Resident's personal information requested by a third party to determine Resident's rental history or for any other legitimate business purpose. Resident also hereby consents to Management's disclosure of Resident's personal information requested by a law-enforcement or other governmental agency making such a request for legitimate government purposes.

**34. Consent to Solicitation.** Resident hereby consents to Management's debt collection agency or other debt collector (the, "Authorized Entities") communicating with Resident in the event Resident has a debt owed to Management after the termination or expiration of this Lease. Any such communication may be made through any method for any reason related to an amount due and owing from Resident to Management under this Lease. Resident authorizes all such communication methods even if Resident will incur a fee or a cost to receive such communication. Resident shall

IN EUP No Bond, 501C3, Rural 10.1.20

immediately notify the Authorized Entities . .,y telephone number, email address or other unique   ,tronic identifier that Resident has provided to any Authorized Entity, changes or is no longer used by Resident.

Management may call or text Resident with promotional or marketing messages. To consent to the receipt of such messages, please provide the following information:

Name: _____     Telephone: _____

Signature: _____     Opt Out:  ☒

**35. AFFORDABLE HOUSING PROGRAM COMPLIANCE:** Resident acknowledges the Apartment Community operates under Section 42 of the Internal Revenue Code ("Section 42") and that Resident's rental benefits and occupancy of the Rental Unit and use of the Apartment Community are conditioned by a limitation on the combined gross annual income of each household member residing within the Rental Unit ( hereinafter, "Gross Household Income") and a limitation on the total number of household members residing within the Rental Unit (hereinafter, "Total Household Members") (hereinafter, collectively, "Section 42 Program Requirements"). Resident acknowledges Resident has been advised of the Gross Household Income and Total Household Member limitations imposed by the Section 42 Program Requirements applicable to Resident as of the date of this Lease and any renewal hereof and that such limitations are subject to change. Resident shall (a) notify Management immediately, in writing, of any change occurring, at any time during a term of this Lease Total Household Members, and (b) in the event of any such change, shall immediately provide Management with all information necessary for Management to determine whether Resident still complies with the Section 42 Program Requirements. In the event Resident, (i) fails to provide such notice, as required above, (ii) fails to provide the information necessary to determine Residents compliance with the Section 42 Program Requirements, or (iii) does not qualify under or comply with, the Section 42 Program Requirements as determined by Management upon any review of information related to the Section 42 Program Requirements (whether such information is provided by Resident or otherwise) then Management may, as determined by Management in its sole discretion, exercise any and all rights and remedies available to Management hereunder including, but not limited to, immediate termination of this Lease.

Resident shall provide to Management, within five (5) business days following a request by Management, whether prior to, during or subsequent to the Term, or any other term of this Lease, all information requested by Management necessary to certify or re-certify Resident's income and other eligibility factors under the Section 42 Program Requirements. In the event that, (a) Resident fails to provide the Section 42 Program Requirements information required above, or (b) Management determines upon its review of the Section 42 Program Requirements information, that Resident does not qualify under, or comply with, the Section 42 Program Requirements, then in the event this Lease is not otherwise terminated by Management as provided in the paragraph above, this Lease shall terminate upon the expiration of the then current term of this Lease. In the event Resident fails to provide the Section 42 Program Requirements information required above after a Lease term has expired or been terminated, or in the event Management has accepted Residents surrender of the Rental Unit, then Management may bring appropriate legal action in any court of competent jurisdiction to obtain any such information from Resident and Resident shall pay the costs of any such action, including court costs and attorney fees, incurred by Management in connection with any such legal action. This provision shall survive the expiration or termination of this Lease.

At least ninety (90) days prior to the expiration of the Term, and at least ninety (90) days prior to the expiration of any other term in excess of ninety (90) days, Resident shall recertify to Management the Gross Household Income and the Total Household Members and supply Management with all information required to determine Residents eligibility to lease the Rental Unit. In the event Resident is not eligible to lease the Rental Unit for another term this Lease shall not renew for any additional term and this Lease shall terminate as of the date of expiration of the Term or any other term.

**Income:** Under the Section 42 Program Requirements, Resident's Gross Household Income is allowed to increase up to 140% of the current applicable income limit and Resident still remain income eligible for the program. In the event Resident's income increases above 140% of the maximum allowable income as governed by the Section 42 Program Requirements, management may increase the rent to the maximum Housing Credit rent with a thirty (30) day written notice, and may later convert the unit into a market rate unit. If Resident is no longer income eligible under the Section 42 Program Requirements, this Lease may be terminated as provided above.

**Loan:** If the rent charged by Management inadvertently exceeds the amount allowed to be charged by Management pursuant to the Section 42, in order to comply with Section 42, any excess amount of rent shall be considered a loan from Resident to Management and shall be repaid to Resident by Management, together with interest at 8% per annum.

**36. ATTACHMENTS.** (Made a part of this Lease by reference)

(a) Application to Rent
(b) Move in/Move Out Inspection
(c) Animal Addendum (if any)
(d) Community Addendum

I have read and agree to the terms set forth herein:

_____   04-06/2-1
Resident: SHEDRICK NORTHERN                Date

_____   4-06-21
Owner's Agent                Date

IN EUP No Bond, 501C3, Rural 10.1.20